represent one of the appellants that is Anastasia Mancini. I do not represent Mr. Zuvulis, who for whatever reason has chosen not to argue. Ms. Mancini is not a party to any contract, except there's an issue in this case in which financial casualty claims that she's a party to a contract that was never became effective. The court recognized financial casualty, admitted that they repudiated the contract, they canceled the agency before they countersigned the agreement. One second. Did she sign the 2010 agreement? She signed the agreement, but financial casualty did not sign it. They signed it two months later. Okay, but open issue about what effect that has, whether there was offer and acceptance or not, for example. If you look at how the parties conduct themselves, financial casualty usually signs those contracts sometimes months after they go into effect, correct? And sometimes they sign it the next day. Sometimes, and sometimes. But I don't see how you can conclude that there's no contract just because there's no signature there. They have an insertion, and there's a case in point that we cite from the Fifth Circuit, defining a Texas case, the Scafee case. In the Scafee case, the court had a signature block with signature blanks exactly like those in our case, and they held that the parties can evidence their contract however they like, so long as it's clear. And in these instances, the three prior contracts, there's a pattern suggesting that financial casualty does not sign simultaneously with the effectiveness of the contract. That's true. And what financial casualty is doing, in effect, is giving themselves an option. By handing a contract to someone, it's an invitation to sign the contract, which the signing of the contract would be an offer. All the cases say that. There is no case that says that the giving of a blank contract, an unsigned contract, is the offer. It's the first signature that is the offer, and the acceptance is done by a signature. Now, what financial casualty does is they mix up the issues. They cite cases where they talk about acceptance could be by some other method. But there was no other method in this case because the contract, nothing was ever done pursuant to the contract. Now, also, they're mixing it up. Can I ask you this? What is the term of the last contract? The contracts have no term. How come they have no terms? I asked financial casualty. It's an open contract. The fact is prior contracts, which are with other sub-agents, were never terminated. They're going to make an argument that because there's a cause in this contract. I'm trying to understand whether Ms. Vanzini would be responsible for losses occasioned by the earlier contract. And one easy way to look at that is that there's a term of the contract. But I looked at the contract. I can't find one. You're telling me there is none. There is none. And this contract, by holding her kind of holder on indemnity to prior agreements, there's nothing in this contract that relates it to the prior agreements. Every bond that was sold by Mr. Zouvelos was under a prior contract. The courts under Texas law say you cannot extend an indemnity by implication, that you have to read it narrowly. There is nothing in this contract that says that she's liable for something under another contract, to which there are other parties as well. And what they're trying to do is mix it all up. Same thing, there's no consideration. The 2010 contract expressly says it supersedes and cancels all prior agreements, correct? Yes, but she's not a party to any prior agreements. I'm just trying to understand the relationship. And you may have an argument with regard to Vanzini, but it doesn't seem likely the parties would just cancel those prior agreements when there were still bonds, there were still collateral, there was still work to be done under those prior agreements, that they would enter into a new contract that didn't incorporate the earlier bond into the new arrangement. I would think that financial casualties intention on the prior agreements and on this agreement, that each agreement relates to the bonds that are sold and the time period in which that contract is in effect. In this contract, even though it says it supersedes and cancels prior agreements, she's not a party to any prior agreements that she's superseding or canceling. Maybe you could argue if Mr. Zouvelos' counsel was here, she would probably argue that there's no contract in effect with Mr. Zouvelos because they canceled everything. For my client, it's simpler. She's not a party to any prior agreement. Now, as far as the counter signatures are concerned, all the prior agreements have been countersigned, some within a few days, some within a few months. All of them have been notarized under the SCAPI case, as I've been saying. It's required. Otherwise, to have their signature is a superfluous act. And moreover, when they intended, when they canceled the contract, it's before they countersigned it because they knew that they have an offer in which they would have to accept that they did not accept. Now, I'd also like to point out that there was no consideration. The court below got it backwards, as financial casualty does. They argue, as the court below found, that in terms of consideration, because Ms. Mancini had no prior obligations, by obligating herself allegedly under this contract, that that was a consideration. But that's a consideration that she's giving to financial casualty. Financial casualty gave no consideration to her. And that's the new tool. She was involved in the business and presumably wanted her husband to continue in the business. And so by signing the agreement, they were moving the relationship forward. Why isn't that consideration to her? You know, this is a fact that has been distorted. The business that she had cut slips. First of all, she did not take ownership or control of that business until 2011. The judge points that out in her own decision at SPA 16. So we're talking about – Was she unrelated to the business before then? She was unrelated. She may have worked for it. It's not clear. It's not clear. It's not clear. And as far as that business was concerned, they talk about that she gained money. First of all, this is a breach of contract case. It's not a corporate identity case. It's not a fraud case. And the only money that cut slips ever got that's in the record is three transactions totaling $1,250, all of which postdated the alleged contract that they're placing this claim on. Can I ask you about a language in Paragraph 1 of the 2010 agreement that says producer and producer indemnitor, who I gather is Ms. Mancini, shall be liable to company for all liabilities, claims, and demands without limitation, which arise from or relate to bail bond powers of attorney and trust producer by the company, regardless of who actually executes said bonds. Why doesn't that reflect her undertaking? Because the only contract that has a producer is this contract. In the prior contracts, Mr. Zubelis is an indemnitor, or he's an agent, or he's a subagent. This is the only contract under which he's a producer. And within the four corners of this agreement, to say that she's liable under some other prior agreements, we're going way beyond the four corners, and we're implying that she's liable for other contracts for whom other people are also liable, and for other agents that obtained the commissions. She got no commissions on the bonds that they're trying to hold her liable for. Now, if I could talk about the collateral shortfall claim. There's two claims in this case. One of them is for bond forfeitures. If the arrestee does not show up in court, he loses the bond. If you lose on this appeal, how should these forfeitures be handled? Because nobody knows how much there's going to be. Well, I think we're confusing two different liabilities. Quite possible. The forfeitures are if the arrestee doesn't show up in court, he who forfeits the bond. I'm speaking of the collateral. The collateral shortfall, but that constitutes that the family, usually the family member of the arrestee. We don't know. I mean, the judgment doesn't, it puts a figure on it, but it's unknown how much it's going to be. It's hypothetical. It doesn't exist. It's a hypothetical claim. For all we know, likely claim, but it's not a likely claim because the statute of limitations ran on all the underlying claims. The collateral shortfall, they obtained from all the money they seized, and they seized this money before they even tried to get the new contract signed. It was clear they didn't intend to be bound by it. They seized lots of money. After all the figures, they were holding $240,000 for unclaimed money from family members, who, by the way, the statute of limitations on their claims ran. Don't they have a duty to go out and try to find them if the bail bondsman is holding money? I'm sure my adversary will get up here and tell you that. Does the law require it? I'm not disputing that. I'm asking you a question. Does the law require it, yes or no? No. Because financial casualty has no privity with these family members. What the court essentially did is they made them into a stakeholder, gave them $240,000, said that my clients or the defendants are liable for another $140,000 in hypothetical money that may be owed to people whose statute of limitations ran out, and now you go ahead and you figure out what to do with it. It's not a class action. It's not a bankruptcy. They're not trustees. Who are they? They're a company. Even if a statute of limitations is run, if you're holding somebody else's money, you have at least a moral obligation, if this industry is to be run on moral principles, to locate the people whose money you're holding and give it back to them. But I'm not here arguing about the money they're holding. I'm here arguing about the hypothetical claim for over that, where the court did a calculation that say there may be another $140,000 that are owed on top of the $240,000. Thank you. And that's hypothetical. Now, the last thing I want to talk about is the fee, if I may. Do you want to use some of your rebuttal time? I'll use a moment, if I may. The fee is absurd. Now, the plaintiff's attorneys talk about their experience. They do this. They've had cases in this court all over the place. Somehow they spent over 2,000 hours against pro se defendants who they claim gave them a hard time. The only hard time they claim they had was over answers to some interrogatories, which we pointed out in the court below took out maybe 60 hours of their time. How do they go and claim legitimately, reasonably? I mean, I don't mean to be disrespectful, but do you seriously expect us to go over the bills? Usually we expect the district court to do it. The district court is familiar with the thing. And we won't follow that unless you can point out something specific. Rather than just say lawyers are running bills out of control, I mean, unfortunately that's daily life. I will posit what I hope is a simple answer. The courts generally say you should not get an attorney's fee for a higher amount than you recover in damages. The actual damages that were recovered in this case were $98,000 for the forfeitures. That should cap the attorney's fees. Well, but plus the $143,000 as a collateral. Well, I believe that should be set aside. That's my position. We're looking at a measure still. And we review this for abuse of discretion, correct? For attorney's fees only. Attorney's fees, correct. Thank you. Good morning, Your Honors. May it please the Court. My name is Deborah Donaldson, and I represent SCS in this matter. And this Court should affirm the trial court's judgment for three reasons. First of all, a valid contract formed, there was consideration for it, and under the plain meaning of that indemnity contract, Ms. Mancini is liable for all of the bonds for which her husband wrote on SCS's behalf of surety. What's the consideration? The consideration, Your Honor, is that requiring a spouse to sign an indemnity contract is common, and it's reasonable and supported by consideration. First of all, it allows a surety like SCS to have security in the jointly held property, and it prevents sureties from losing their claim because spouses who are a party to their contract put the assets in another spouse's name. No benefit. I'm sorry, you're calling this an indemnity contract. This is a retail producer bail bond agreement? That's correct, Your Honor. Because while there are indemnity provisions in there, they are remarkably still imprecise with regard to preexisting obligations. And the language I read to your adversary suggests that it has to do with bail bond powers of attorney by the company within a timeframe, although, as Judge Jacobs pointed out, there doesn't seem to be a very well-specified term. You know, the obligation of an indemnitor usually is strictly construed, and I gather under Texas law it is particularly strictly construed. With regard to Ms. Mancini, both the consideration issue and the language of the contract, which is not called an indemnity contract, seems quite unclear. Well, it's true, Your Honor, that this is a bail bond producer contract. However, there are significant indemnity obligations in it, and Ms. Mancini is a producer indemnitor, which is why I'm referring to her obligations under the contract as an indemnity contract. What's the strongest language in the contract that would incorporate all prior obligations incurred? In paragraphs 1 and 10, Your Honor, there are broad indemnity provisions that do not include any limitations on her liability. But in addition to that, I'd like to refer the Court back to some of those. If I may, just to follow up on Judge Carney's question. She read a text, and I hate to hang things on a single letter, but the end of the text that Judge Carney read says, regardless of who actually executes said bonds, it doesn't say regardless of who actually executed such bonds. So this is either, this is in the present tense, and therefore it would seem to cover bonds that are executed in the future. If you intended to include all the bonds regardless of who executed them in the past, you would have used the past tense. Well, I disagree with that, Your Honor, and here's why. This contract superseded and replaced the previous contract. And in the context of bail bonds, as the Court pointed out earlier, there is a continuing obligation on the part of both the surety and the bail agent past the time the bond is exonerated until all of the liability for those bonds written is run off or completely satisfied on the part of everyone. So these bail contracts, these bail agency contracts, actually brought forward the liability from the previous contract. And one way we know that that was the party's intent is that if you look at the trust ledger, which is in the joint appendix, and I believe it's in the 500s. I apologize for not having a specific record site for that. But if you look at that trust account ledger, you'll see where FCS carried forward, for example, Mr. Zouvelos' buff account, which was kind of a reserve that was required that FCS held as a portion of the premium that Mr. Zouvelos earned so that they could satisfy collateral shortfalls or forfeiture judgments in the event that Mr. Zouvelos did not comply with his obligations under the agreement. So that trust ledger shows that the previous buff funds were brought forward. The liabilities were brought forward. Once again, I have to point out that the language isn't precisely what you said. It doesn't say supersedes and replaces all prior agreements. It says this agreement supersedes and cancels all prior statements, representations, negotiations, and so on. I think it's ambiguous with respect to it's meant to encompass all previous relationships, particularly because the parties are different, the language is different. There are lots of gaps and changes in each of those agreements. It's remarkably inspecific with respect to whether this encompasses, unless you can point me to something else, whether it encompasses and takes on all prior obligations between any one of the parties and the company. Well, Your Honor, I have a two-part answer to your question. And the first part is that neither party argued in the trial court that this agreement is somehow ambiguous or, you know, otherwise unclear. That's a newer argument on behalf of Ms. Mancini. Did Ms. Mancini agree that this took on all prior liabilities between Mr. Zouvelos and the company? I'm sorry, is your question that did she agree? Did she agree or did she, she didn't challenge that? She has not agreed. However, going back to your question regarding the cancellation of the agreement, I'll agree with you. I mean, that's exactly what the contract says, that it supersedes and cancels. However, other than that one word, there's no provision regarding some kind of novation or discharge of previous liabilities under the contract. Now, suppose Ms. Mancini asked to affix her signature, had said, wait a minute, is this going to make me liable for all of these bail bonds that were issued under the prior agreement? I think somebody could say, don't worry about it, because this document supersedes and cancels all prior agreements. Now, I agree it makes very little sense, because if it does, then it seems to wipe out all of the obligations that everyone agrees subsist. But as far as Ms. Mancini is concerned, being asked to sign on, it looks like she's signing on to an agreement that cancels all the prior agreements, and therefore it becomes very hard to imagine how she could have thought that she was signing on to all of these prior bail bonds. The answer to that question is, Your Honor, both in paragraphs 1 and 10, with that broad indemnity language, coupled with the other provisions in the contract, which I believe are in the contracted paragraphs 17, 31, and 32, that all of the liabilities on the previous bonds, at least with respect to the runoff of that liability, continued going forward into the future. Absolutely. The runoff continues, but Ms. Mancini was being asked to sign a single contract, and that contract said, I mean, I keep chanting the same words that Judge Garner keeps reading, but it says it supersedes and cancels all the prior agreements. So I'm not sure I see why Ms. Mancini would think that she's therefore signing on to the obligations under superseded and canceled contracts. Well, the fact of the matter is, Your Honor, there's no evidence in our record that Ms. Mancini, at least at the time, you know, certainly in the trial court she did, but at least at the time, there's no evidence in the record that she ever questioned the terms of these agreements or asked for clarification or balked at signing them. Was there any expert testimony as to how things are done in this industry, or let alone that Ms. Mancini would be sufficiently familiar with those terms? Mr. Padilla's testimony, Mr. Padilla has more than 25 years of experience in the bail bond industry. He was an investigator, yes. And was an officer of FCS at the time. He did address those issues. I'd like to point the Court, though, to two analogous cases that address the issue of an indemnitor's responsibility when there's broad indemnity language. The first is American Contractors Indemnity Company v. WEDCO, which is from the Eastern District of Missouri, and Developer Surety v. Network Electric, which is from the District of Utah. These are both cases that deal with performance bonds. And even though it's not completely on point because of, you know, the different context of how bail bonds are written, these cases do talk about a flip side of the coin, which is whether indemnitors can be held liable, for example, after a marriage or, excuse me, after a divorce or after the indemnitor has left the company. And what these courts focused on was that when there is broad indemnity language, that the Court is going to enforce it as it's written. And what mismanaging these expectations were in signing the contract, I can't speak to. However, what I can speak to is the fact that each subsequent contract in this context did replace the previous, but the liabilities between the parties continued and were continued to run off. And so for that reason, this broad indemnity language requires Ms. Mancini to indemnify SDS for all of the bonds that Mr. Zouvelos read going back to his initial relationship with the company in 2008. I know your red light is on, but I wondered if you could take a moment with the presider's permission to address the collateral shortfall damages. I understand that a plan was developed because it was possible that FCS was going to be left with money that it offered to SG to the State if it was unable to identify all the indemnitors who were potentially entitled to reimbursement. But I couldn't understand really why FCS hadn't already attempted to return the collateral to those indemnitors that were identified in the spreadsheet when litigation was ongoing. And I wonder if you could say what has been returned, in fact, and what kind of claims have been made and where, I guess this isn't in the record entirely before us, but maybe you could still speak to what the status of the plan is. I'd be happy to, Your Honor. And the short answer is that FCS intends to fully comply with Judge Donnelly's plan to identify the indemnitors and return the collateral as the bonds require. It has not done so to date. It's still in the process of attempting to locate all of these indemnitors because, as the record reflects in painful detail, the records that Mr. Zutolos provided to FCS, or in many cases did not provide, make it incredibly difficult to locate each of these indemnitors. The size of the fund is around $500,000 total, like $240,000 plus $140,000, so $380,000 maybe? I believe that's the case, Your Honor, and it's unclear, though. There was a total, which Mr. Padilla testified to, that FCS's liability on the universe of these bonds may be as high as $1.8 million. The collateral shortfall that was identified in the trial court was really just what we could prove within a reasonable certainty. Is Judge Donnelly supervising this? Is there a commitment to SG to the State? Any remaining funds after a certain time period has passed? What exactly does the plan call for? The plan calls for FCS to identify the indemnitors to the degree it can, to locate them. Is there a time period? Judge Donnelly did not include a time period in her order. Has your client, in fact, committed to SG to the State after a time has passed, say five years? Any funds remaining? If you're having so much difficulty and claims haven't been made, an argument was made that the statute of limitations had run in any event, it would seem inappropriate for your client to retain those funds. Well, Your Honor, FCS has an ongoing obligation, and Justice Johnson mentioned this ongoing liability, that there's no really statute of limitations. These collateral funds are held in trust for those indemnitors. I'm not personally aware of a provision under New York law that requires, as sometimes there is for bank accounts or that kind of thing, a requirement that FCS achieve the money to the State. However, what I will tell you is FCS intends to . . . Your client had offered to do that, though. I'm sorry? Your client had offered to do that. Is that wrong? I'm not aware of that from the record. If you are, I'm not going to argue with you. What I will say to you, however, is that FCS takes its responsibility to the New York Department of Financial Services and to the citizens of New York very seriously, which is why it has prosecuted this case as vigorously as it has against Mr. Zubilis and Ms. Mancini. And the record is full of reasons, you know, why FCS has chosen to not allow them to retain any of the funds that they wrongfully withheld, particularly from the collateral. When you said that the amount levied in the judgment was only what you could prove . . . Correct, Your Honor. What you were proving, correct me if I'm wrong, was that this money would be owed, not that you had located the people to whom the money was owed, because if you did, presumably, you would have sent them a check. We do owe it to them, and we intend to return it to the degree that we can. And to the degree we can't, we're . . . You can, but that sort of feeds your adversary's argument that this is an arbitrary number, because even though you know that this money is owed, you don't know whether you're going to be able to compensate these people for what they've lost. I agree that the business was run in a deplorable manner, considering the trust that's associated with these funds, and certainly it's your obligation and it's a matter to be applauded that you're going to look at these people, but the question is, how do you get the money from the defendants when you don't know that you're going to be able to send the money to the people who own it? Well, I have about three responses to your question, Your Honor, so I'm sorry to go in a bunch of different directions, but let me start with the legal answer to your question, which is not by far the most compelling or the most interesting, but let me give you the legal answer to your question, which is, if you look at Texas law on indemnity agreements, which understood that we're talking about just the indemnity language here, in Amwes v. Cardenas, the Northern District of Texas talks about the kind of language used in an indemnity agreement, whether it's a liability indemnity agreement or a damages indemnity agreement. The indemnity language in this case, regardless of whether we're talking about Mr. Zuvilos or Ms. Mancini, is broad enough to encompass not just judgments for which FCS had to pay damages, such as the bond forfeiture judgments, but also the liability that they incur on the bond. So, from a legal standpoint, FCS is entitled to the money because it has liability on each and every bond that Mr. Zuvilos wrote that is still out there in the universe and for whom there are indebtedors in the State of New York who are collateral. Turning to, you know, the theoretical nature of the damages, we went with the best evidence we had, given the imperfect amount of information that Mr. Zuvilos had provided. And so, we proved the damages we could to a reasonable amount of certainty. FCS intends to comply with Judge Donnelly's order to locate these indemnitors, to return the money to them, and to the degree we cannot do that, we will work with the New York DFS to try to satisfy any indemnitors who come forward and seek the return of their collateral. Under the indemnity agreements, they specifically refer to if they breach this agreement. They claim it's an indemnity agreement, they rely on indemnity clauses, they refer to this agreement, that's a JA572 and 573. As far as there's no consideration is given, they haven't said it, they haven't done anything, they haven't given them an opportunity to make any sales. As far as the claim, the collateral shortfall, they have no liability. They have no privity, they have no standing, and it's not right. We cited a case, Financial Casualty v. Parker, and in that case, which involved forfeitures, for which there's no question, no liability, they took the position that no loss occurred until there was an actual judgment saying how much they were liable for. In that case, there was a judgment of liability, and they claimed that that was not sufficient to establish that they were liable, and therefore the statute of limitations did not begin running until there was an actual judgment. So all the claims they're making about the collateral estoppel are, for many, many reasons, the excess they're trying to recover from the defendants is just totally without basis. Thank you. Thank you both. Very helpful, and we'll take the matter under advisement. The next case on the calendar is Shams v. Lakeland Central School District. Thank you.